(No. 4661- )

JOHN SWETS, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed January 14, 1958.*

MATHIAS, MELOY AND MERKER, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; RICHARD F. SIMAN, Assistant Attorney General, for Respondent.

TOLSON, C. J.

On January 6, 1955, claimant, John Swets, filed his complaint for damages in the amount of $3,750.00 for the alleged neglect of the servants of the State of Illinois in spraying chemicals on the right-of-way of the Calumet Superhighway.

The matter was heard by Commissioner Herbert G. Immenhausen, and the following portion of his report is hereby adopted by the Court:

*"Commissioner's Report*

John Swets, by his attorneys, Mathias, Meloy and Merker, filed a complaint in the above entitled cause on January 6, 1955, wherein claimant seeks to recover the sum of $3,750.00 from respondent, the State of Illinois, for damages to 8 acres of tomatoes, which were planted during the growing season of 1954.

On or about the middle of July, 1954, respondent's employees and agents were in the process of spraying weed killer on the right-of-way of the Calumet Superhighway at or near 8 acres of land, which claimant had under cultivation. Claimant alleges that the employees or agents of the Division of Highways did not use care in conducting the spraying operation at a time when the wind was blowing across claimant's 8 acres of growing tomatoes, and, as a result, a substantial amount of weed killer was deposited on claimant's growing tomatoes, and his crops were damaged and destroyed in an amount of 75% of the crop, causing a loss of $3,750.00.

The bill of particulars filed by claimant alleges that claimant was raising tomatoes under contract with the Campbell Soup Company; that the tomatoes picked on the 8 acres in question totaled 51 tons; and, that the yield should have produced 22 tons per acre, or 176 tons. The loss was computed at $30.00 per ton, or 125 tons, making a loss of $3,750.00.

Respondent, the State of Illinois, did not file an answer, and a general traverse or denial of the fact shall be considered as filed. Repondent filed a Departmental Report (Exhibit 2) with the Court of Claims on February 13, 1957. The matters contained therein shall be prima facie evidence of the facts set forth therein, (Rule 16, Court of Claims).

*Departmental Report*

On July 13, 1954, the Larkin Spraying Service was doing work for the Division of Highways, and, at the direction of this office, was spraying the

median strip of Calumet Expressway between 159th and 167th Street. This area includes that portion of the highway right-of-way, which adjoins the property of Mr. Swets.

The spraying was done with a truck mounted sprayer unit, which was equipped with a hand operated gun type nozzle. This nozzle was manipulated by a man from the truck.

The Expressway at that location runs in a north-south direction. The tomato field in question joins the Expressway right-of-way on the west side of the Expressway, and extends approximately 497 feet in a southerly direction and 624 feet in a westerly direction. The median strip, which was being sprayed at this time, is parallel to the east edge of the tomato field and 130 feet west. Thus, the nearest point of exposure was 130 feet.

The wind on this date was out of the northeast at a velocity of 6.1 miles per hour. The temperature was 84 degrees.

The chemical applied at this time was a low volatile tetrahydrofurfuryl ester of 2, 4-D. The solution was applied at the rate recommended by the manufacturer. The Larkin Spraying Service applied 2, 4-D to approximately 200 acres of right-of-way on the Calumet Expressway.

A letter, dated August 19, 1954, from the law office of Messrs. Mathias, Meloy and Merker, who represented Mr. Swets, informed us that the tomato crop of Mr. Swets had been damaged to the extent of 50% of the anticipated yield.

After the letter was received in this office, Mr. Tipsword of the Expressway office contacted Mr. Swets, and his report was as follows:

"I talked with Mr. Bernard Swets, who represented his brother, Mr. John Swets, who resides at 169th Street and the east frontage road of Calumet Expressway, relative to the above mentioned subject. Mr. Swets and I visited the field of tomatoes, which he contends were damaged by our weed killer spray.

The field is located at 165th Street and the west frontage road of Calumet Expressway, and extends 520 feet along the west frontage road, and 624 feet in a westerly direction away from the frontage road.

I walked over the field with Mr. Swets while he pointed out the alleged damage. He indicated curled leaves and fruit, which were imperfect, also leaves which were deeply serrated. He contends that these are symptoms of 2, 4-D damage. In my examination of the field, I noticed that the symptoms, which Mr. Swets indicated, were not more pronounced nearer the roadway nor less pronounced at the opposite of the field, as one would expect, but were uniformly distributed throughout the entire field. In no case did we find any dead plants, and all plants, which we examined, bore fruit in various stages of maturity.

I, also, noted that a tomato field adjoins the field of Mr. Swets on the south, and lies in the same relative position along the frontage road; also, there is a field approximately one-half mile north of this location along the frontage road.

Mr. Swets and I then talked with a Mr. Thad Stoltz, who is a "Field Man" for the Campbell Soup Company. Mr. Swets is raising these tomatoes

under contract with the Campbell Soup Company, and Mr. Stoltz related that representatives of his company had estimated the yield of this field earlier in the season and again recently; the latest estimate showed a 50% decrease over the earlier estimate. The Campbell Soup people contend that this decrease in estimated yield is due to the effects of 2, 4-D, which Mr. Swets contends was brought about by our operation.

I then talked, by phone, with a Mr. Robbins of the Campbell Soup Company Research Bureau. Mr. Robbins explained the procedure for estimating the yield of a field of tomatoes before they have come into production. This estimating is done, as he explained it to me, by a complicated process of counting the fruit blossoms on several plants, and multiplying this result by the number of plants in the field. He, then, explained that the later estimate, after the alleged damage, was made on the basis of results obtained by experiments, which the Campbell Soup Company has made, in which they applied controlled amounts of 2, 4-D to tomato plants, and compared the production of these affected plants with normal plants.

Since I am unskilled in the science of tomato growing, it is my recommendation that this office contact a person in the Agricultural Department to make a study to determine whether or not this field of tomatoes has been damaged, and whether or not this damage can be attributed to 2, 4-D, or to a disease or insects. Also, if the damage is attributed to the presence of 2, 4-D, it should be determined whether the Division of Highways is responsible, or whether one of the nearby farmers applied 2, 4-D to his cornfield.

If it is found that the Division of Highways is responsible, we should receive an independent opinion as to the extent of damage."

Another letter from Messrs. Mathias, Meloy and Merker on behalf of Mr. Swets was received in this office. This letter, dated September 10, 1954, stated that "All tomatoes have been picked from this field, and a total of 49½ tons have been delivered to the Campbell Soup Company". This letter further stated that the field should have produced 150 tons of tomatoes, and asked for a settlement of $3,000.00.

Mr. Tipsword made a further report to this office on September 24, 1954, as follows:

"On September 23, 1954, at 11:50 A.M., I had occasion to travel south on Calumet-Kingery Expressway. Mr. Andrew Speder and I were traveling together, and, as we passed the field of tomatoes owned by Mr. John Swets, I noted that the field was still being picked. Several people were loading tomatoes onto a truck, and many baskets, filled with tomatoes, were in the field.

This brings to mind the fact that the letter of September 10, 1954 from the legal representatives of Mr. Swets presented an untrue picure of the total yield of this field. This letter stated that all tomatoes had been picked from this field, and a total of 49½ tons had been delivered to the Campbell Soup Company. Although 49½ tons of tomatoes might have been delivered to the Campbell Soup Company, obviously all tomatoes had not been picked.

Therefore, their mathematical process used for arriving at an alleged damage of 100 tons from our weed spraying operations does not account for the tomatoes picked since September 10th."

We were again contacted by Mr. Swets' attorneys by letter, dated October 18, 1954. This letter stated that the harvest of the 8 acres of tomatoes had been completed, and that the yield was 51 tons, and that the yield should have been 176 tons on the basis of other acres planted by Mr. Swets. This letter asked for damages of 125 tons, or $3,750.00.

We have recently contacted a Mr. Davies, who is the Divisional Agricultural Manager for the Campbell Soup Company. He gave the following statistics relative to tomato yields for the South Holland area:

Five year average:
Years 1949 through 1953 _____ 9.07 Tons per acre
Years 1950 through 1954 _____ 10.05 Tons per acre
Year 1954 _____ 13.13 Tons per acre

Mr. Davies disclosed the fact that the absolute maximum yield for this area in 1954 was 22 tons per acre. He also gave the following general information concerning the 1954 tomato season:

'1954 was one of the wettest years; it was one of the shadiest years on record; 1954 was also a bad year for sour flies and fruitworms.'

*Yours very truly,*
/s/ J. P. TUTHILL,
*District Engineer"*

Your Commissioner heard the evidence pursuant to notice on January 16, 1957, at 160 N. LaSalle Street, Chicago, Illinois. Claimant's attorney called Mr. Wayne Tipsword under Section 60 of the Civil Practice Act for cross-examination. He testified that he was employed in July, 1954, by the State of Illinois as a Landscape Architect, and that at present he is Assistant Manager to the Expressway Maintenance Field Engineer, Division of Highways, Department of Public Works and Buildings. That in July, 1954, he met Mr. Bernard Swets at his home in South Holland. That on July 13, 1954, the State of Illinois by its agents sprayed the parkway between the lanes of Calumet Expressway in the locality of Mr. Swets' farm. The spray used was 2, 4-D, which is a selected weed killer of ester type. He saw Mr. Swets approximately 6 weeks after the state had sprayed the highway, and inspected a field containing tomatoes alongside of the west edge of the highway covering 7½ acres. The tomatoes were in the same condition as other fields in the vicinity. He stated he was not an expert on tomatoes, but did know the effect of 2, 4-D on tomatoes. Its effect would depend on the intensity of the vegetable plant leaf, which would be affected by this type of weed killer. It would depend on the wind. If the wind was traveling 6 miles per hour from the northeast, I do not think the weed killer would affect tomatoes for more than 150 feet away. By stipulation, respondent's exhibit No. 1, a plat, was admitted into evidence. On respondent's cross-examination, Mr. Tipsword stated that the instructions given to the agent were not to spray weed killer when the wind exceeded 8 miles per hour, and not to spray susceptible plants, such as trees, along the right-of-way, and, in general, to use caution in the method of its application; on further examination by Mr. Carr he said that he visited Mr. Swets' farm, and wrote a report in which he stated 'I walked over the field

with Mr. Swets while he pointed out the alleged damage. He indicated curled leaves and fruit, which were imperfect, and also leaves, which were deeply serrated. He contends that these are symptoms of 2, 4-D.'

Next witness called was Mr. John Swets, who testified that he lived in South Holland at 166th and Emerald, and was a farmer. He identified the plat introduced into evidence by agreement, and stated that the tomatoes were growing on his land situated south of the Calumet Expressway in July, 1954, that the plants were bearing some fruit and some blossoms; that some tomatoes were present, and that some of the plants were blooming prior to July 13, 1954. That on July 13, 1954, he noticed they were spraying along the Calumet Expressway, and went down to the truck from which the spraying was being done; that the truck was one block north of the north edge of his tomato field; that the parkway was being sprayed, with a hand nozzle spray, that the spray was going into the air about 10 to 12 feet. At that time the wind was blowing from the east, and that both he and his brother asked them to stop the spraying because of the tomatoes. The man handling the spray at the time was standing on the truck about 3 feet above the roadway on a platform; that he told them he owned this patch of tomatoes, and the weed killer was awfully hard on tomatoes; that the wind was from the east at the time, and that he told them it would do a lot of damage, if it continued. He tried to stop them, but they said that they were hired by the state, and were going to continue. They proceeded to spray the highway, and he noticed a mist traveling toward the west going up as high as 10 or 12 feet. This field contained 8 acres of tomatoes, and, after July 13th, the new foliage on the tomato plants was pointed something like fern. He noticed this about 10 days after the spraying, and he further noticed that the tomatoes did not grow any more, and that the blossoms and leaves were curling. Eventually the tomatoes on the 8 acres were harvested, and yielded 51 tons. They were sold at $33.00 a ton, and he started picking some tomatoes the latter part of July to the time of freezing, which were delivered to the Campbell Soup Company at their loading station in South Holland. They were to be used by the company for tomato juice, tomato soup and probably vegetable soup. He noticed, after spraying, the tomato plants remained small, and did not grow anymore. This was caused by 2, 4-D.

Claimant's next witness was Wayne Robbins. He testified that he was the Divisional Plant Pathologist and Genetologist for the Campbell Soup Company, and that he attended the Iowa State College where he majored in plant physiology. During his association with the Campbell Soup Company he had specialized in tomatoes; that he had had occasion to experiment and observe the use of various solutions known as weed killers on tomato plants, primarily 2, 4-D; and, that he had observed the effect of 2, 4-D on tomato plants.

He was acquainted with the land owned by John Swets in the vicinity of South Holland, Illinois, which borders the western edge of the Calumet Expressway. He visited this particular plot in August of the summer of 1954, about two weeks after July 13, 1954; that he examined the damaged plants, and that they manifested symptoms typical of 2, 4-D damage. Those symptoms consisted of twisting of stems, peteyal formation of leaflets, and distor-

tion of leaflets. There was a dropping of blossoms, and a general dwarfing of the plants.

A volatile ester type of 2, 4-D is used commonly for weed control. It can affect living vegetation even after it has been applied, since the formulation of 2, 4-D may revolatize to a period of at least two weeks subsequent to the time of application, and the volatile vapors are as toxic as the material itself on direct application.

The vapors of the toxic material flow through the air for varying periods of time, depending upon its strength and the temperature conditions. They will keep emanating from the point of application, and drift through the air in whichever direction the wind is blowing. He stated that from his experience this can continue for around two weeks after the original application, and he had known of symptoms that would appear 16 days after the application. He had performed 2 separate experiments in 2 separate years, 1952 and 1953, on the effects of 2, 4-D upon tomato plants.

Thereupon, claimant's exhibit No. 1, a United States Weather Report, was introduced and admitted into evidence. It showed that on July 13, 1954, the maximum temperature was 93, and the minimum was 75. The average wind was northeast at 6.1 miles per hour. The maximum wind on that date was 12 miles per hour. Though there was no rain on July 13th, there was a trace of rain on the 14th.

Thereupon, claimant's attorney, Mr. Carr, asked a hypothetical question based upon the testimony heretofore given, and asked for an opinion based upon a reasonable degree of scientific certainty as to whether or not there could or might have been a causal connection between the condition of the tomatoes at approximately two weeks subsequent to the application of the 2, 4-D taking into consideration the temperature and wind velocity. His answer thereto was that, in his opinion, the plants were damaged as a result of the 2, 4-D being sprayed at the center of the road.

The next witness called by the claimant was Phillip Paarlberg, who resides at 166th and Cottage Grove, South Holland. He is a supervisor for the Campbell Soup Company in the South Holland area, and his duties are to follow the tomato crop from beginning to end, checking it daily, and answering calls, if any farmer has difficulties. He held that position in 1954, and testified he was acquainted with the 8 acres of tomatoes owned by Mr. J. Swets; that this field was just west of the Calumet Expressway; that he visited the Swets farm about three times prior to July 13, 1954, that it was an excellent field, and had prospects of a real good crop of tomatoes.

He was acquainted with other tomato fields in the vicinity of Mr. Swets' farm, where the soil was the same, the same plants were used, and the weather conditions were the same; that he knew of the yield of tomatoes in these fields for the year 1954; that one field yielded 26 tons per acre, one a little over 20 tons, and the other approximately 22 tons per acre.

He went to Mr. Swets' farm subsequent to July 13, 1954, and saw it at least once a week until the harvesting was finished; that during these visits the stems didn't get any more fruit, and on some of them the fruit was very small; that the average tomatoes were about 100 fruit to the 33-pound hamper,

and these averaged between 180 and 200 fruit to the 33-pound hamper; that the vines did not develop any new growth to amount to anything; that he noticed the change in the appearance of the vines 10 days after the spraying occurred; and that from his experience he indicated that the vines had been affected by 2, 4-D.

Bernard Swets was called by claimant as the next witness, and stated that he resides in South Holland next door to his brother; that he was acquainted with the fields of tomatoes situated on the west side of the Calumet Expressway; that the fields contained 8 acres, and were planted in tomatoes; that he had occasion to go into the tomato fields during the growing season of 1954, and on many occasions cultivated them; that on July 13, 1954, he saw a truck engaged in spraying moving south on Calumet Expressway. He went home and got his brother, went back to the truck, because he could smell what they were spraying and asked them to stop. In reply, they said that they had orders to spray, and he told them to go ahead, and they would suffer. They went ahead and sprayed.

The spray appeared to be a mist, and, while they were spraying the center, the wind was blowing from the northeast, which caused it to drift. The spray rose into the air like dust as high as 10 feet.

Subsequent to July 13, 1954, he noticed that the leaves being produced were fern-like instead of a real leaf, and the leaves would just curl up; that they harvested 8 acres, and the entire yield was 51 tons. He knew that, because they kept tract of the amount harvested, and were paid $30.00 a ton for the tomatoes."

The Commissioner recommended an award in the amount of $1,621.20. The basis of this award was the average yield of 13.13 tons per acre, as disclosed by the Departmental Report, rather than the 20 tons as testified to by Phillip Paarlberg, a crop supervisor, residing in the vicinity.

This Court has little difficulty in finding that claimant was damaged by the negligent acts of respondent, but has considerable difficulty in assessing his damages.

An examination of the abstract of the record discloses that five persons testified as to the facts of the case. One witness, Phillip Paarlberg, gave his opinion as to the tons per acre grown in the immediate vicinity. Claimant, John Swets, offered testimony as to the yield on a tract five miles away, which testimony was properly excluded by the Commissioner.

John Swets and his brother, Bernard, are tomato growers in the vicinity, yet they did not testify as to the yield from neighboring fields. Both Paarlberg and a Mr. Davies, mentioned in the Departmental Report, are employees of the Campbell Soup Company, yet their report on average yield is substantially different.

Mention was made that the crops were picked by Mexican and negro laborers, and, thereafter, hauled to market. Yet, there was no evidence as to the costs of such services, which would be in mitigation of the claim.

As to proof of damages, the rule is set forth in *Wright* vs. *Wagner Dairy Co.*, 338 Ill. App. 211, 86 N.E. (2d) 857:

"The general rule with regard to proof of damages is that the evidence must afford data reasonably certain from which a court or jury may find the actual loss, and plaintiff must show by a preponderance of the evidence the damages caused by injuries complained of."

Since the evidence is conflicting, and respondent admits, by its Departmental Report, that the average yield was at least 13.13 tons per acre, that figure will be used as follows:

```
8 x 13.13—$105.04 @ $30.00 per ton_____$ 3,151.20
Received 51 tons @ $30.00 per ton_____ 1,530.00
 _____
Loss _____$ 1,621.20
```

An award is, therefore, made to claimant, John Swets, in the amount of $1,621.20.